J-A16022-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: M.D.A., AN ALLEGED INCOMPETENT PERSON | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.D.A. | : : : : : : | |
| | : | No. 1142 MDA 2022 |

Appeal from the Order Entered July 12, 2022
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
88000

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED DECEMBER 04, 2023**

M.D.A. ("Mother") appeals from the order entered on July 12, 2022, in the Court of Common Pleas of Berks County Orphans' Court Division, adjudicating her to be an incapacitated person and appointing her son, J.D. ("Son"), and his wife, K.L.D. ("Daughter-in-Law") (collectively "Petitioners"), as plenary co-guardians of her person and her estate.[1]  For the reasons set forth below, we quash this appeal.

This matter stems from a petition for the appointment of emergency co-guardians of Mother's person and her estate filed by Son and Daughter-in-Law on December 10, 2021, pursuant to 20 Pa.C.S. § 5513.  Orphans' Court Opinion ("OCO"), 9/26/22, at 1.  Mother was born in August of 1944 and has

---

[1] The order at issue is appealable as of right pursuant to Pa.R.A.P. 342(a)(5) ("An appeal may be taken as of right from … orders of the Orphans' Court Division … determining the status of … guardianship[.]").

resided at Phoebe Berks ("Phoebe"), a nursing care facility, since September 13, 2021. *Id.* Petitioners reside in Harrisburg, Pennsylvania. *Id.* at 1-2. Mother also has a daughter, K.D.-R. ("Daughter"), who resides in New York, New York. *Id.*

In May of 2021, Mother called Son and "cried that she needed help and needed somebody to take charge." *Id.* at 5. She was living in South Carolina at the time. *Id.* A week later, Petitioners drove to South Carolina from Pennsylvania. *Id.* When they arrived at Mother's gated community, she could not remember how to use the buzzer to open the gate. *Id.* Mother had lost weight because she was not eating. *Id.* Her home was in a disheveled condition, and she had placed post-it notes all over the house. *Id.* "Her checkbook was in disarray. Many bills were unpaid even though she had the money to pay them." *Id.* at 6 (citation omitted). Since Mother was "stressed out and frazzled," Son brought her back to Pennsylvania to live with him and his wife. *Id.* He told her that the arrangement was only temporary until her affairs were in order. *Id.*

On June 17, 2021, Mother signed a general power of attorney ("POA"), appointing Petitioners as her agents. *Id.* at 2. In July of 2021, Son had Mother evaluated by Chen Zhao, M.D., a neurologist. *Id.* at 2, 6. Dr. Zhao determined that Mother suffers from Alzheimer's disease, anxiety, and sleep

disturbance. *Id.* at 2. She concluded that Mother was "incapacitated[2] and unable to make informed decisions about her finances and healthcare. She also opined that Mother should be in a secured facility for her safety and basic needs." *Id.*[3] Based on Dr. Zhao's evaluation, Son placed Mother in personal care at Phoebe on September 13, 2021. *Id.* at 2, 6. *See also id.* at 6 (noting Daughter informed Son that "if he did not want Mother, she would take her," but Son decided that was not a good idea).

Petitioners allowed Daughter to take Mother for a one-week visit to her home in New York over Thanksgiving 2021. *Id.* at 2. During that visit, Daughter had Mother revoke her POA in favor of Petitioners and had her sign a new POA in favor of Daughter. *Id.* "Daughter refused to return Mother to Phoebe." *Id.* Thus, on December 10, 2021, Petitioners filed a petition seeking to be appointed as co-guardians of Mother and her estate, "to allow [them] to

---

[2] Chapter 55 of the Probate, Estates and Fiduciaries ("PEF") Code, 20 Pa.C.S. §§ 101-8815, defines an incapacitated person as "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S. § 5501.

[3] We observe that Dr. Zhao's expert report indicates Mother was "independent in basic [activities of daily living,] though require[d] prompting to attend to grooming" and recommends a "social worker to assist with home health services info" for Mother's physical health and safety. Petition, 12/10/21, at Exhibit A ("Dr. Zhao's Expert Report" at 3). In Dr. Zhao's opinion, the most appropriate, least restrictive living situation for Mother would be a "secure facility[.]" *Id.* at 4.

move Mother back to Phoebe as soon as possible to avoid possible harm to Mother." ***Id.***

A hearing on the petition was originally scheduled for December 21, 2021, and Rebecca L. Bell, Esquire, was appointed as counsel for Mother. ***Id.*** at 3. Daughter filed a response to the petition, in which she averred that "Mother has the requisite capacity to determine her own living arrangements[,]" and that "Daughter wants Mother to live her remaining days with family so long as it is feasible." ***Id.*** After several continuances, a hearing was held on July 12, 2021, at which Gary Champlin, Ph.D., a geriatric psychology expert; Michele Butch, the administrator of the personal care facility at Phoebe; and Son testified on behalf of the Petitioners. Daughter and Mother were called as witnesses on behalf of the respondent. N.T., 7/12/22, at 2.

The orphans' court summarized Dr. Champlin's testimony, based on his December 27, 2021 independent evaluation of Mother, as follows:

> He determined that Mother had difficulty with information about her medications and power of attorney and other memory difficulties. Dr. Champlin believed that Mother was doing well at Phoebe, which seemed like an appropriate placement [considering] Mother's cognitive limitations. He believed that her wishes to live with family should be respected if a comparable level of care could be given by the family. At the time of the hearing, Mother's expressed choice was to live with Daughter in the Bronx.
>
> Mother's prognosis is poor in terms of her cognitive abilities, and there is a need for guardianship services. Dr. Champlin opined that neither of the power of attorneys were likely valid. Mother has cognitive deficits that affect her ability to make good

decisions. She does not know her medications. Her cognitive deficits are progressive.

OCO at 3-4 (citations to record and some paragraph breaks omitted).

Ms. Butch explained that the personal care facility at Phoebe where Mother resides provides "activities of daily living" for residents, like Mother, that are in between independent living care and skilled nursing care. *Id.* at 4; N.T. at 34. She described Mother as "very pleasant. She's a very nice[,] graceful lady." N.T. at 36. Ms. Butch further testified that Mother's primary issue concerns her cognition and memory. OCO at 4. She explained that the staff at Phoebe assists Mother with administering her medicine, offers her standby assist with showers, and reminds her to go to meals. *Id.* Ms. Butch also indicated that Petitioners have not authorized Phoebe to share any information with Daughter. *Id.* *See also* N.T. at 48 (Ms. Butch's noting that when Daughter called the facility inquiring about Mother, she would refer her to Son). "There are constant telephone calls between Mother and Daughter. Ms. Butch believes that these calls deter Mother from leaving her room and that they interfere with Mother's behavior and demeanor and her activities within the facility." OCO at 4.

Son is retired from the military. *Id.* at 5. He testified that he had a good relationship with Mother until approximately ten to twelve years ago. *Id.* He claims that he stopped communicating with Mother because she became "very condescending, dismissive, disrespectful, and nasty." *Id.* *See also* N.T. at 86 (Son's stating that "we haven't been in contact for 10 to 12 years until she called me in May of 2021"). Son reported that during the four

- 5 -

months that Mother lived with him, he prepared meals for her, had to remind her to bathe, and had to show her daily how to make coffee. *Id.* at 6. "Son believes that neither he nor Daughter can take care of Mother due to her Alzheimer's disease." *Id.*

Regarding Daughter's interactions with Mother, Son testified that he originally put Daughter on the "access list" at Mother's doctors' offices and at Phoebe; however, he revoked her status when Daughter started cancelling Mother's appointments and telling Mother not to take her medication. *Id.* In February 2022, Son permitted Mother to visit Daughter in New York for two weeks, because Daughter wanted Mother to be evaluated for an in-home care plan. Son stated that the care plan addressed only cleaning and providing lunches; it failed to address Mother's needs due to her medical condition. *Id.* at 7. On at least two occasions, Son refused Mother visits with Daughter because of medication issues. *Id.*

Son acknowledged that his relationship with Mother is "still contentious at times." *Id.* He admitted that they argued in June of 2022, and that he told Mother that "he should have left her ass in South Carolina" due to her behavior. *Id.* Notwithstanding, Son does not believe that it is relevant who has a better relationship with Mother – only the type of care Mother needs is relevant. *Id.* He believes that it is important for Mother to be at a facility that can take care of her now and in the future. *Id.*

Daughter works as a civilian principal for the New York Police Department. *Id.*[4] She resides with her husband, who is retired. *Id.* Daughter testified that she has "a great relationship" with Mother. *Id.* at 8. She talks to Mother all the time because she does not want her to feel lonely or depressed. *Id.* Daughter acknowledged that there was a period of approximately 5 years during which she did not speak to Mother; however, Daughter was 23 years old at the time their rift began and is now 57 years old. *Id.* *See also* N.T. at 136 ("It was a long time ago…, but then we made up. And ever since then, we've been back to the way we always been.").

Daughter recalled that Mother called her in May of 2021 and told her that Son was coming to visit her. N.T. at 138. Daughter informed Son that she wanted to be Mother's caretaker, but he said that was wishful thinking and that Mother needed a facility. OCO at 8.[5] Once Mother was placed at Phoebe, she would occasionally stay with Daughter. N.T. at 140. Daughter

---

[4] Mother explained, "[M]y position is called principal. I am a supervisor equivalent to a lieutenant." N.T. at 135. She supervises administrative staff. OCO at 7.

[5] Daughter testified that she made it "very clear" to Son that she was willing to be Mother's caretaker. N.T. at 139. *See also id.* (Daughter's recalling telling Son that "before [Mother] goes to any facility, she will come and live with me"); *id.* at 140 (Daughter's recounting a conversation with Daughter-in-Law the night before Petitioners were taking Mother to Phoebe: "[Daughter-in-Law] called me and told me that they were putting her in a facility. And I told [her], … no, I will leave my house right now. I will come pick her up. She doesn't have to go to no facility. And [Daughter-in-Law] said it was a done deal, that it's too late. If I wanted my mom, I lost my chance because I didn't go pick her up from South Carolina.").

stated that, prior to Mother's visit over Thanksgiving in November of 2021, Mother "was supposed to come live with me." *Id.* Mother had given Phoebe her thirty-day notice twice to go live with Daughter,[6] but the first time, Daughter-in-Law talked Mother out of it. OCO at 8. At this point, the court interrupted Mother's testimony and urged counsel to move on with any remaining witnesses.[7]

During Mother's testimony, she declared, "I would like for my daughter to take charge of me and my estate…. Because she understands me, she talks to me, and she lets my wish [*sic*] be known[,] and she does what I want, not what she wants." N.T. at 145. Mother expressed that Daughter cares about her and loves her very much. *Id.* When asked where Mother wants to live, she responded, "My desire is to live with my daughter…. Because she respects me and she listens to me[.]" *Id.* at 146. Mother prefers living in a home as opposed to a facility and finds Daughter's home "very comforting and secure." *Id.* at 148. *See also id.* at 147 (Mother's testifying that she is not happy living at Phoebe and stating, "I want to live with my daughter.").

In contrast, Mother stated that Son told her during a recent visit that he has a life to live. OCO at 8; N.T. at 146-47. Mother does not think Son

---

[6] *See* N.T. at 141 (Daughter's explaining that she spoke with Ms. Butch and that Ms. Butch said Mother "could make her own decisions. The only thing that [Mother] had to do was give her 30-day notice.").

[7] The court interjected, "I understand…. It's clear what we have here. Now, who else are we going to have testify?" N.T. at 141. Counsel for Mother replied, "My client." *Id.* The court stated, "Well, why don't we get to that." *Id.*

respects her wishes or does what is in her best interest. N.T. at 147. She described her experience living with Son and Daughter-in-Law as "uncomfortable." *Id.* at 148. "Because they had their life, and they were living their life, and I felt I was interrupting them." *Id.* Mother recalled Son becoming upset with her during his last visit with her when she refused to sign a document that he wanted her to sign. *Id.* at 149. "His eyes were bulging, and he was very upset, and he was right in my face almost nose to nose saying I should have left your ass in South Carolina." *Id.* at 150. Mother indicated that she felt like Son was "filled with hate and disgust" for her, that Son does not visit or call her, and that she does not think Son has the level of compassion for her that is needed to serve as her guardian. *Id.* at 155-56.

After considering the foregoing evidence, the orphans' court entered its July 12, 2022 order, declaring Mother to be an incapacitated person and appointing the Petitioners as permanent, plenary co-guardians of Mother's person and her estate. OCO at 8. On July 21, 2022, Mother filed a timely motion for reconsideration, in which she requested that the orphans' court reconsider its decision and schedule a hearing to consider the appointment of a professional guardian, Sharon Gray, Esquire. Motion for Reconsideration, 7/21/22, at 2-3. *See also id.* at ¶ 9 (explaining that while Mother desired for Daughter to be appointed as her plenary guardian, her "secondary choice would be for a professional guardian to be appointed"); *id.* at 10 ("Due to the lateness of the hour and the desire of the court to complete the testimony, [Mother] did not get to present her proposed order appointing Sharon Gray,

Esquire as her plenary guardian.") (cleaned up). Petitioners filed a response on July 26, 2022. On August 3, 2022, the orphans' court entered an order expressly granting Mother's motion for reconsideration and scheduling a hearing on the matter for August 11, 2022. By order of court dated August 10, 2022, the August 11, 2022 hearing was continued to October 18, 2022.

On August 11, 2022, Mother filed a notice of appeal from the court's July 12, 2022 decision appointing the Petitioners as her plenary co-guardians. In response, the orphans' court directed her to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Mother complied, and the orphans' court filed its Rule 1925(a) opinion on September 26, 2022. On appeal, Mother presents a single issue for our review: "Whether the lower court erred in appointing [Mother's] Son and Daughter-in-Law as plenary guardians instead of selecting either a professional guardian or … [Mother's] daughter?" Mother's Brief at 9 (cleaned up).

Preliminarily, we must determine whether this appeal is properly before us. "Timeliness of an appeal is a jurisdictional matter which can be raised by the court *sua sponte*." **Penjerdel Refrigeration Corp., Inc. v. R.A.C.S., Inc.**, 442 A.2d 296, 297 (Pa. Super. 1982) (citations omitted). Thus, we consider the timeliness of Mother's appeal under the guidance of the following applicable rules.

Pennsylvania Orphans' Court Rule 8.2 provides, in relevant part: "By motion, a party may request the court to reconsider any order that is final under Pa.R.A.P. 341(b) or 342, or interlocutory orders subject to immediate

appeal under Pa.R.A.P. 311, so long as the order granting reconsideration is consistent with Pa.R.A.P. 1701(b)(3)." Pa.O.C.R. 8.2(a). **See also** Pa.O.C.R. 8.2, *Explanatory Comment* ("The period for filing an appeal is not tolled by the filing of a motion for reconsideration unless the court grants the motion for reconsideration prior to the expiration of the appeal period." (citing Pa.R.A.P. 1701(b)(3))); Pa.R.A.P. 903 (stating that a notice of appeal shall be filed within 30 days after the entry of the order from which the appeal is taken, except as otherwise set forth in Rule 903).

Pursuant to Pennsylvania Rule of Appellate Procedure 1701(b)(3), after an appeal is taken, the trial court may:

> (3) Grant reconsideration of the order which is the subject of the appeal…, if:
>
> > (i) an application for reconsideration of the order is filed in the trial court … within the time provided or prescribed by law; and
> >
> > (ii) an order expressly granting reconsideration of such prior order is filed in the trial court … within the time prescribed by these rules for the filing of a notice of appeal … with respect to such order, or within any shorter time provided or prescribed by law for the granting of reconsideration.
>
> **A timely order granting reconsideration under this paragraph shall render inoperative any such notice of appeal … theretofore or thereafter filed or docketed with respect to the prior order.** The petitioning party shall and any party may file a praecipe with the prothonotary of any court in which such an inoperative notice … is filed or docketed and the prothonotary shall note on the docket that such notice … has been stricken under this rule. **Where a timely order of reconsideration is entered under this paragraph, the time for filing a notice of appeal … begins to run anew after the entry of the decision on reconsideration, whether or not that decision amounts to a reaffirmation of the prior**

**determination of the trial court....** No additional fees shall be required for the filing of the new notice of appeal....

Pa.R.A.P. 1701(b)(3)(i), (ii) (emphasis added).

Instantly, Mother timely filed her motion for reconsideration of the July 12, 2022 decision on July 21, 2022. On August 3, 2022, within the 30-day appeal period, the orphans' court expressly granted reconsideration, thereby tolling the appeal period. *See* Pa.O.C.R. 8.2, *Explanatory Comment* ("The period for filing an appeal is not tolled by the filing of a motion for reconsideration unless the court grants the motion for reconsideration prior to the expiration of the appeal period."); Pa.R.A.P. 1701(b)(3) ("Where a timely order of reconsideration is entered under this paragraph, the time for filing a notice of appeal … begins to run anew after the entry of the decision on reconsideration, whether or not that decision amounts to a reaffirmation of the prior determination of the trial court…."). Nevertheless, Mother filed her notice of appeal to this Court on August 11, 2022, and the orphans' court never reached a decision on reconsideration.

Under these circumstances, Mother's notice of appeal was ineffectual, and we are constrained to quash this appeal. *See* Pa.R.A.P. 1701(b)(3) ("A timely order granting reconsideration under this paragraph shall render inoperative any such notice of appeal … thereafter filed or docketed with respect to the prior order."); ***Pa. Prop. & Cas. Ins. Guar. Ass'n v. State Farm Ins. Co.***, 853 A.2d 407, 409 (Pa. Super. 2004) (noting that the trial court retained jurisdiction even though a notice of appeal was filed during the

appeal period, as the timely order granting reconsideration rendered the notice of appeal inoperative).

We note that once a timely order expressly granting reconsideration is entered, there is no time constraint imposed on the orphans' court for the entry of its reconsidered decision. **See** Pa.O.C.R. 8.2; Pa.R.A.P. 1701(b)(3). Thus, the orphans' court may proceed with its consideration of Mother's request for the appointment of a professional guardian. Further, nothing herein shall be construed as preventing Mother and/or Daughter from requesting a review hearing pursuant to their rights under Section 5512.2 of the PEF Code. **See** 20 Pa.C.S. § 5512.2 ("The court shall conduct a review hearing promptly if the incapacitated person, guardian or any interested party petitions the court for a hearing for reason of a significant change in the person's capacity, a change in the need for guardianship services or the guardian's failure to perform his duties in accordance with the law or to act in the best interest of the incapacitated person."). In addition, given that Mother's disease is progressive[8] and that her circumstances may have changed since the July 12, 2022 hearing, we point out that the orphans' court is empowered to conduct a review hearing at any time, at which it should honor Mother's wishes to the fullest extent possible. **See** 20 Pa.C.S. § 5512.2 ("The court may … hold a review hearing at any time it shall direct.");

---

[8] **See** Dr. Zhao's Expert Report at 4 ("Alzheimer's is a chronic and progressive condition.").

- 13 -

*Interest of M.A.*, 284 A.3d 1202, 1215 (Pa. Super. 2022) ("The PEF Code mandates that orphans' courts honor, to the extent possible, the wishes of the [alleged incapacitated person]." (citing 20 Pa.C.S. §§ 5502; 5521(a))); *In re Estate of Rosengarten*, 871 A.2d 1249, 1255 (Pa. Super. 2005) (emphasizing that "the intentions of the incapacitated person are to be honored to the fullest extent possible").

Appeal quashed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 12/04/2023